56 CCPA

**Application of Charles D. PRATER and James Wei.**

**Patent Appeal No. 7987.**

United States Court of Customs and Patent Appeals.

Nov. 20, 1968.

Woodcock, Phelan & Washburn, Virgil E. Woodcock, Philadelphia, Pa. (James H. Littlepage, Washington, D. C., Donald L. Dickerson, O. G. Hayes, New York City, N. Y., D. Carl Richards, Richard E. Kurtz, Dallas, Tex., of counsel), for appellants.

Joseph Schimmel, Washington, D. C., (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and KIRK-PATRICK,* Judges.

SMITH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals[1] affirming the rejection by the examiner of all claims of appellants' application.[2]

The issues involved relate to an invention against which no prior art has been cited. The rejections of the process and apparatus claims are solely based upon considerations of law and statutory construction.

The invention is concerned with spectrographic analysis and is intended to facilitate the provision of accurate data on the relative proportions of various known constituent gases in a mixture of gases. In performing such analysis, the spectograph produces a spectogram, typically in the form of a trace, having a plurality of peaks. For each peak a first order linear equation may be derived by conventional mathematics relating the height of the peak on the spectogram to the relative concentrations of the constituent gases in the mixture. The equations are of the general form:

$$Y_1 = a_{11} x_1 + a_{12} x_2 + a_{13} x_3 \ldots a_{1m} x_m$$
$$Y_2 = a_{21} x_1 + a_{22} x_2 + a_{23} x_3 \ldots a_{2m} x_m$$
$$\vdots$$
$$Y_n = a_{n1} x_1 + a_{n2} x_2 + a_{n3} x_3 \ldots a_{nm} x_m$$

where

$Y_1, Y_2 \ldots Y_n$ = peak heights of peaks 1,2 ... n respectively of the spectrogram

$x_1, x_2 \ldots x_m$ = relative concentrations of m constituent gases Nos. 1,2 ... m respectively present in the mixture

$a_{11}, a_{12} \ldots a_{nm}$ = coefficients representing the contribution that each gaseous component makes to the height of each peak.

———◆———

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Consisting of Friedman and Kreek, Examiners-in-Chief, and Andrews, Acting Examiner-in-Chief, opinion by Kreek.

2. Serial No. 155,236, filed Nov. 20, 1961 entitled "Reduction of Data From Spectral Analysis."

As the spectrogram customarily includes more peaks than there are constituent gases in the mixture (i. e., n is larger than m), more than enough equations are available to provide several subsets of equations, each of which subsets is capable of having the equations within the subset solved simultaneously for the values of the concentrations of the constituent gases. In an ideal world where the peak heights could be measured with 100% accuracy, it would not matter which particular subset of equations was selected for solution as any subset of equations equal in number to the number of the constituent gases, would solve to the same values.

Applicants, however, like the rest of us, work in the real world where the measurement of peak heights is subject to varying degrees of error from peak to peak. As a result of the varying degrees of error in peak measurement, the equations in one subset (relating to one particular selected subset of peaks) when solved simultaneously may yield values for the various concentrations of gases which vary from the values that would be derived from solution of the equations in a different subset relating to a different selection of peaks.

In this situation appellants have made a discovery which lies at the heart of their invention. Appellants have discovered a way to identify one particular subset of equations, related to one optimum set of peaks, which provides significantly more accurate values for the concentrations of the constituent gases than the other subsets. Selection of the optimum subset of peaks, in the absence of applicants' invention, may sometimes be a staggering problem. For example, we are informed that for a ten-constituent mixture and a resulting spectrogram containing twenty peaks, there are 184,-756 possible subsets of ten equations, which would mean 184,756 different possible sets of ten peaks to be chosen out of the twenty peaks available.

It is appellants' discovery that the optimum set of peaks (for derivation of the most accurate concentration results) may be isolated and selected by finding the subset of equations having the largest determinant amongst all the possible subsets that might be chosen. This discovery, so far as the record shows, is entirely novel.

Applicants have also disclosed, in detail, a machine for carrying out their invention. As disclosed in the specification, this machine includes a battery-energized motor which drives the armatures of ganged rotary switch sections through a mechanical linkage. The motor is stopped when the solenoid of a relay is energized by the amplified output of a photocell which scans the oscilloscope screen and is responsive to a maximum signal appearing on that screen. The signals produced on the oscilloscope screen correspond to the magnitude of the determinants of the several sets of equations. These signals are brought together on the screen within the view of the photocell. Movement of the photocell downwardly across the face of the oscilloscope is accomplished by said motor of the machine which also drives said photocell carrier through a gear box. When the photocell photo-electrically senses the upper end of a determinant trace on the oscilloscope screen, its electrical response is amplified and this energizes the relay which stops the motor. It is at this point that the machine has identified the "determinant of greatest magnitude." Stopping of the motor simultaneously stops operation of the rotary switches driven by the motor and the valves of the circuits which are established at that point are displayed on meters. The reading on each meter reveals the concentration of one selected gaseous component for which the sample is being tested.

The various mathematical coefficients to be dealt with in utilizing appellants' method are represented in the disclosed machine by various voltages in various circuits. In this manner, the coefficients of the relevant mathematical formulae

appear as electro-mechanical elements in appellants' machine.

The specification sets forth in detail the electrical and mechanical components of this machine and their respective functions to relate the mathematical coefficients inherent in the present invention to a step in the method and to a means in the machine which directly performs the mathematical functions which underlie the present invention.

Appellants' specification describes the operation of the claimed machine in relation to the mathematical content of their claimed invention, and points out that as the motor rotates the armatures of the ganged rotary switch banks through, for example, six pre-set separate positions, the values of the determinants for six sets of equations represented by these six positions of the armatures can be ascertained.

While the disclosed method and machine are described in a preferred embodiment by reference to an analog computer, which the above-described machine is, such device is visualized by appellants as but one device having the inherent capabilities to perform the desired functions. As pointed out in appellants' brief:

If the execution be by a digital computer, there will be provided at the input of the computer the same signals appearing at the terminals at the left-hand side of Fig. 2. Instead of voltages, the magnitudes of which represent the needed quantities, the digital signal will comprise a series of spaced pulses in number and of polarity representing numbers in the binary system respectively equal to the magnitudes of the quantities. Thus, in the digital computer, the electrical signals are discrete in character. In the analog apparatus they are continuous. The output of the computer will again represent discrete electrical signals representative of numbers and these signals either with or without analog

conversion will be utilized for the operation of indicating equipment as, for example, meters like the meters 113 and 123 of Fig. 3.

The claims on appeal are directed both to the method (claims 1, 6–9, 12 and 17–21) and to the machine (claim 10) embodiments of this invention.[3] Typical of the method claims is claim 17 which reads:

17. The *method of determining* with minimum error from the spectra of spectral analysis the *concentration of the components of a mixture* where the components are known and the concentration-determining peaks of the spectral analysis are present in number exceeding the number of said components, which comprises

*generating physical representations* of the magnitudes of the coefficients of simultaneous linear equations defining the concentrations of said components as functions of the heights of said peaks of said spectral analysis,

*generating* from said physical representations of the magnitudes of said coefficients the *magnitude of the determinant* of a plurality of sets of said simultaneous equations, the number of equations of each of said sets being equal in number to the number of said components,

*comparing* said physical representations of the *magnitudes of said determinants* of said sets of equations *for identification of the set* of said equations *whose determinant has the largest magnitude,* and

*generating physical representations of the concentration of each said component of said mixture from said physical representations* of the magnitudes of said coefficients of *said set* of simultaneous equations *having said determinant of largest magnitude* and from said heights of said peaks included in said last-

---

3. Throughout this opinion, we shall use the term "apparatus" and its statutory form "machine" interchangeably.

names [sic] set of equations. [Emphasis added.]

Machine claim 10 reads:

10. In spectrographic analysis where, from a given mixture of m constituents, spectral functions having peaks therein are obtained and wherein the relationships between the concentrations of said constituents and the peaks in said function correspond to relationships in a set of linear simultaneous equations, *the system* for selecting from said functions the combination of m of the n peaks therein least susceptible to error in concentration determination, where n is an integer greater than m, *which comprises means* for generating a scalar function representative of the determinant for a first set of said equations corresponding with a first set of peaks in number equal to m, *means* for generating successive scalar functions each representative of a determinant for sets of equations corresponding with different sets of m of said peaks *and means* for determining that one of said scalar functions of greatest magnitude for identification of said combination of m of the n peaks least susceptible to error. [Emphasis added.]

Our selection of the foregoing claims for discussion here has been influenced by the board's selection in its opinion of the same claims for exemplification. We do so because we agree with the board that these claims are typical and present the issues to be decided, and because this common selection will reduce the chance of error in understanding the issues and our resolution of them.

The examiner's position before the board, as set forth in his Answer, includes a rejection of the method claims for failure to comply with 35 U.S.C. §§ 101, 102 and 112. A sequence of initial steps of reasoning adopted by the examiner in this rejection, is: (1) that if the invention is to fall within a statutory class under section 101 it must be as a "process"; (2) that the claims are readable upon a mental process; and (3) claims to a mental process are unpatentable (in support of which proposition the examiner quotes portions of In re Abrams, 188 F.2d 165, 38 CCPA 945 (1951)). The examiner then proceeds with development of the rejection in two alternative forms.

In the first form of the rejection under 35 U.S.C. §§ 101 and 102, the examiner argues, on the one hand, that if the *novel part* of a claim is readable on subject matter which is unpatentable because it is outside the statutory classes of patentable subject matter, then the claim as a whole is unpatentable under 35 U.S.C. § 101; and, on the other hand, if the claim reads on the physical process of a person marking paper during calculation by hand, then the claim is unpatentable under 35 U.S.C. § 102.

In the second form of the rejection, under 35 U.S.C. §§ 101 and 112, the examiner argues that if the claim *covers* subject matter outside the statutory classes (as well as subject matter within the statute) then the claim fails to particularly point out and distinctly claim the invention, as required by 35 U.S.C. § 112.

The examiner's Answer also includes two forms of rejection for the apparatus claim 10. In the first form, stated to be under 35 U.S.C. §§ 101, 102 and 103, the examiner argues that, having the principle of mathematics derived by appellants, it would be an obvious modification of a known general purpose digital computer to program it accordingly.

The sceond form of the apparatus claim rejection is under 35 U.S.C. §§ 101, 102, 103 and 112. The reasoning of this rejection is that even if it should be determined that claim 10 reads on apparatus invented by appellants on which they are entitled to patent coverage, namely the analog embodiment disclosed, nevertheless the claim still embraces the properly programmed general purpose digital computer on which appellants are not entitled to coverage for the reasons

previously stated, wherefore it does not particularly point out *appellants'* invention, as required by section 112.

The board first considered the examiner's first alternative form of rejection of the process claims under 35 U.S.C. §§ 101 and 102. The board found that the claims set forth nothing which could not be performed purely as a *mental* exercise using appellants' discovery and were of the opinion that the claims did not therefore fall within the statutory category[4] of "process," as interpreted by court decisions. In reaching this result the board cited Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139 (1877) and In re Shao Wen Yuan, 188 F.2d 377, 38 CCPA 967 (1951). The board did not treat the second alternative form of the examiner's rejection of process claims under 35 U.S.C. §§ 101 and 112.

As to the apparatus claim, the board made the following observation:

> Claim 10 is generally an apparatus counterpart of claim 17 except that the last paragraph of claim 17 is not included. It seems to us that, as such, it would not be patentable for the reasoning of the Board quoted with approval of the Court in In re Shao Wen Yuan, supra, at the top of page 295 as reported in the Commissioner's Decisions. [1951 C.D. 286].

The board also agreed with the examiner that such a machine would be obvious to one skilled in the art, although it seems to us that this bald statement assumes

the availability of appellants' admittedly novel and hitherto unknown discovery.

The board concluded by affirming the *decision* of the examiner which contrasts somewhat with the more usual practice of affirming the *rejections* made by the examiner.

It will be seen that the board's decision did not cover the full spectrum of issues identified by the examiner. As it seems to us that his presentation of the issues was more comprehensive, we shall adopt the general presentation of issues chosen by the examiner, while also treating matters discussed by the board and raised by the parties in their briefs.

## THE PROCESS CLAIMS

*The rejection under 35 U.S.C. §§ 101 and 102*

This first alternative form of the rejection, summarized earlier in this opinion, raises the issue of the patentability of claims containing so-called "mental steps."

The precedents which here have been principally relied on as supporting the rejection of claims of this type are *Abrams,* supra, and *Yuan,* supra. As *Yuan* does little more than follow and adopt *Abrams,* it is to the latter case that we choose to turn as a starting point for our consideration in some detail of the problem presently before us.

---

4. We note the following extract from the board's opinion:
   We are of the opinion that the above claims do not fall within the statutory definition of a process as that term has been interpreted by the courts over the years.

We are unaware of any "statutory *definition*" of a process in 35 USC 101 and assume the board intended to refer to the *category* of "process" in section 101, as interpreted by the courts.

*Abrams'* invention related to a method for prospecting for petroliferous deposits. Figs. 1, 2 and 3 of Abrams are here produced since they provide great assistance in understanding the Abrams'

FIG. 1

FIG. 2

FIG. 3

invention as set forth in the opinion of Chief Judge Garrett. In terms of typical claim 4, appearing in the opinion, Abrams was seeking:

A method of prospecting for petroliferous deposits comprising, (1) sinking a number of boreholes in an area under investigation.

In Fig. 1, a typical borehole 2 is illustrated. The claim then requires:

(2) sealing off each of said boreholes from the atmosphere at any desirable depth below the level of atmospheric breathing in such manner that a known area of the inner surface thereof is made available for diffusion of subsurface gases into said borehole.

This is done by a bull-plug (3) covered with tamped earth (18) to produce the seal.

As stated by Judge Garrett, these two steps 1 and 2 were considered by the court to be old.

Continuing with the claim:

(3) reducing the pressure in said borehole to a value substantially below atmospheric.

This is done by the pump (P) upon opening the valve (11). The pump (14) withdraws gases by way of a pipe (5) from the area beneath the bull-plug (3) until the pressure therein had been reduced substantially below atmospheric pressure. This, of course, caused gases to flow upwardly into the space as indicated by the arrows.

The claim then sets forth:

(4) measuring the rate of pressure rise per unit area of surface available for diffusion of subsurface gases into said borehole for a number of timed intervals.

The pressure measuring device is the manometer 17, Fig. 1, which, by the different heights on two sides of the U-tube, provides a measurement of the pressure in the space covered by the bull-plug (3). An observer periodically reads the pressure of the manometer and then, or thereafter, plots the curves shown in Fig. 2.

The curves are extrapolated to the line for the atmospheric pressure of 760 millimeters. Curve A is for one borehole, and curve B for another borehole. After numerous boreholes are utilized as aforesaid, the points on the 760 millimeter line E are transferred to the graph of Fig. 3 to show anomalies in pressure along the traverse of boreholes indicated as 25–37. The manual plotting of the curves aids in the performance of the further mental step:

(5) determining the rate of pressure rise in said borehole at a standard reference pressure from the values obtained in step (4), * * *

The plot of Fig. 3 provides the final step of:

(6) comparing the rates determined in step 5 for the different boreholes to detect anomalies which are indicative of the presence of petroliferous deposits.

The foregoing brief résumé of the *Abrams* disclosure is deemed important since this court, in that case, properly referred to *Abrams'* specification for aid in interpreting the steps of the claims. It is important to note that *Abrams* disclosed no *means* whatever for performing the claimed steps (5) and (6), of calculation and comparison. Certainly no analog computer for carrying out these calculations is disclosed in the *Abrams'* specification and at the time Abrams filed (April 28, 1944), programmable general purpose digital computers for calculations of this nature were still in the future. Thus, *Abrams* disclosed a claimed process including steps which could *only* be performed in the mind insofar as the teachings of the application were concerned. *Abrams* therefore presents a significant difference (to which we shall refer again) from the factual situation in the present case in which the teachings of the specification provide a full disclosure of apparatus for carrying out the steps in the claim *without requiring any steps to be performed in the human mind.* Additional teaching is also provided in the present applica-

tion that the steps can *alternatively* be performed on other apparatus, i. e., a properly programmed digital computer, which would equally permit the process to be performed without involving steps performed in the mind by those skilled in the art informed of appellants' novel discoveries.

As part of the argument for patentability advanced by Abrams, his counsel composed the following three "rules" which he suggested should be considered by the court, it being his obvious hope to persuade the court that the facts of his case brought him within his rule "3":

1. If all the steps of a method claim are purely mental in character, the subject matter thereof is not patentable within the meaning of the patent statutes.

2. If a method claim embodies both positive and physical steps as well as so-called mental steps, yet the alleged novelty or advance over the art resides in one or more of the so-called mental steps, then the claim is considered unpatentable for the same reason that it would be if all the steps were purely mental in character.

3. If a method claim embodies both positive and physical steps as well as so-called mental steps, yet the novelty or advance over the art resides in one or more of the positive and physical steps and the so-called mental step or steps are incidental parts of the process which are essential to define, qualify or limit its scope, then the claim is patentable and not subject to the objection contained in 1 and 2 above.

The court made clear that it did not consider it necessary for its decision to adopt the proposed rules saying:

From such examination of the decisions as we have been able to make, the suggested rules appear to accord with them, *but it is unnecessary for us arbitrarily to go beyond the requirements of the instant case.* \* \* \* [Emphasis added.]

The court then proceeded to a decision affirming the rejection of the claims, taking as guiding precedents Don Lee, Inc. v. Walker, 61 F.2d 58 (9th Cir. 1932) and Halliburton Oil Well Cementing Co. v. Walker, 146 F.2d 817 (9th Cir. 1944), saying:

The Halliburton, etc. v. Walker case, supra, seems to us to be sound in its reasoning and directly applicable here.

The decision of the Board of Appeals is therefore affirmed.

Although the basis for the *Abrams* decision is clear from the foregoing, much confusion in subsequent interpretation of the *Abrams* decision has been caused by people misreading the decision as conferring judicial sanction upon the "rules" formulated and proposed by Abrams' attorney. This confusion has arisen because the court, after initially declaring there was no necessity to embrace the rules, apparently adopted Rule 2 towards the later part of the opinion.[5] We believe this later statement was advanced not to show adoption of the rules by the court but merely to point out that even if, *arguendo*, the court had adopted his rules, Abrams would still not have prevailed in his particular fact situation.

It is also important to consider the two cases, *Don Lee* and *Halliburton*, supra, considered to validate the proposed "Rule 2." *Halliburton* (an infringement suit) involved a method of well prospecting in which the method claims required steps of computation performed mentally. On appeal, the court decided the claims were invalid, saying:

We think these mental steps, even if novel, are not patentable. Cf. Don

---

5. Near the conclusion of the opinion the court made the following observation which appears somewhat confusing in the light of its earlier comment that it was unnecessary to adopt the proposed "Rules":

When the steps of the claims are considered in the light of the explanation of their character so given, it seems to us that they are eliminated from the applicability of appellant's proposed rule 3, and fall within No. 2.
The court thus hoist Abrams with his own petard.

Lee, Inc. v. Walker, 9 Cir., 61 F.2d 58. * * *

When we trace back to *Don Lee*, we find this case involved claims for a method of counterbalancing engine shafts, which were found invalid in an infringement suit. On appeal, in affirming, the court said:

> We conclude that appellee's patent claim No. 1 for a method of computation for determining the position and weights necessary to counterbalance distortion in a Sharp shaft with an eight-cylinder engine V-type motor is not patentable. We agree with appellant's contention that such a computation is not "a new and useful art, machine, manufacture or composition of matter" within the meaning of section 4886, Rev.Stat. (35 U.S.C.A. § 31) [antecedents of 35 U.S.C. § 101]. *Neither is it novel*, being merely a special case already covered by a general case, or formula, and also by the method of graphic statics which gives a solution without formula or computation, forces being represented by the length of lines and their direction being parallel to the action of the force, the solution being indicated by the length and direction of the line indicating the resultant force. [Our emphasis.]

It will be seen that this statement, which appears to be the genesis of the doctrine of the unpatentability of so-called "mental step" claims, is not only unsupported by any citation of precedent but in its inception was directed to subject matter that was not even novel.

As a partial summary of our reasoning so far, we have observed that the "Rules" of Abrams, so essential to the rejection of the present claims, were not given the status of judicial acceptance by the court in *Abrams* and remain no more than parts of the argument put forward by Abrams' counsel. Further, we note that even if "Rule 2" had been so adopted, the rule when traced to its origin in *Don Lee* rests on an uncertain basis as precedent.

We temporarily set aside our discussion of *Abrams* at this point to approach the questions of patentability of claims of this type in the light of the development of the Patent Law from its Constitutional origin. Article I, Section 8 of the U. S. Constitution gives to Congress the power to promote the progress of "science and useful arts." That a process was an "art" capable of being patented was already considered beyond dispute[6] in Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139 (1876), involving a process or method of manufacturing flour. The issue was infringement, the defendant performing the process using apparatus of somewhat different construction from that disclosed and used by the patentee. The Supreme Court found the patent valid and infringed. In the course of its opinion, the Court produced the following, often-quoted, passage of dictum:

> A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.

This passage has sometimes been misconstrued as a "rule" or "definition" requiring that all processes, to be patentable, must operate physically upon substances. Such a result misapprehends the nature

---

6. "That a process may be patentable, irrespective of the particular form of the instrumentalities used, cannot be disputed." Cochrane v. Deener, 94 U.S. 780 at 787, 24 L.Ed. 139.

of the passage quoted as *dictum,* in its context, and the question being discussed by the author of the opinion. To deduce such a rule from the statement would be contrary to its intendment which was not to *limit* process patentability *but to point out that a process is not limited to the means used in performing it.*

Further expansion of the law relating to process patentability followed shortly after in Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1880). In *Tilghman,* consideration was given to the validity and infringement of a patent on a process for manufacturing fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure. The validity of the patent was attacked since it was for a process and hence embraced subject matter which was not considered to be patentable as an "art," within the meaning of that term in the patent statute in effect at that time. This defense was dismissed by the Court, stating, 102 U.S. at 722, 26 L.Ed. 279:

> That a patent can be granted for a process, there can be no doubt. The patent law is not confined to new machines and new compositions of matter, but extends to any new and useful art or manufacture. A manufacturing process is clearly an art, within the meaning of the law. * * *

What we find interesting in *Tilghman* and directly applicable to our analysis here is the reference, 102 U.S. at 728, 26 L.Ed. 279, to a process as being "an act, or mode of acting" and the further recognition that it is "a conception of the mind, seen only by its effects when being executed or performed." As such, it seems to us that *Tilghman* adds a recognizable dimension to Cochrane v. Deener which focuses attention on the mental aspect of process inventions whose patentability we presently determine under the express provisions of the Patent Act of 1952.

The next step forward in this area for the Supreme Court arose in the Telephone Cases, 126 U.S. 1, 8 S.Ct. 778, 31

L.Ed. 863 (1887), involving processes acting on energy rather than physical matter. Claim 5 of the Bell patent read:

> 5. The method of, and apparatus for, transmitting vocal or other sounds telegraphically, as herein described, by causing electrical undulations, similar in form to the vibrations of the air accompanying the said vocal or other sounds, substantially as set forth.

The Court cited *Cochrane,* supra, with approval for the proposition that a process could be as much the subject of a patent as a manufacture. The Court made no discovery of any "rule" in *Cochrane* that process claims are required to act on physical substances, and went on to find claim 5 (above) valid and infringed.

It is also appropriate, while pursuing this path of reasoning, to observe that the law does not require that a *machine,* to be patentable, must act on physical substances, for example, an electric meter. It does not seem consistent to impose such a requirement on the other category of 35 U.S.C. § 101—a "process"—without clearly evident and distinguishing reasons which are not thus far apparent.

The law relating to process claims continued to be developed by the Supreme Court and in 1935 the Court sustained a claim to a process for securing a function performed in nature by methods not occurring in nature. Two cases, Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935), and Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733, sustained a patent for a method of artificially incubating eggs. In the *Waxham* case the Court said:

> * * * By the use of materials in a particular manner he secured the *performance of the function* by a means which had never occurred in nature, and had not been anticipated by the prior art; this is a patentable method or process. * * * [Emphasis added.]

It is noteworthy in the present appeal that although appellants' novel calcula-

tions performed in the mind of a man might possibly be considered to be in nature, performance of the process of these novel calculations on a computer is by "a means which had never occurred in nature."

The next significant development in the law relating to claims of this type is represented by the 1952 Act which in sections 100 and 101 clearly established the statutory category of "process." The legislative history of the 1952 Act shows nothing that would indicate that the statutory category of "process" was intended to be limited to a meaning less than that given it by the Supreme Court decisions just discussed.

Reviewing the foregoing development of the law relating to process claims, we find nothing to indicate an intent of Congress or the courts to deny patent protection to process claims merely because they could alternatively be read on a process performed through the mind by the use of aids such as pencil and paper. It is therefore an appropriate point to correlate the development thus far traced with our decision in *Abrams* discussed earlier.

We do not feel our reasoning need be encumbered by the so-called "Rules" of *Abrams* for the reasons we have indicated. However, it is noted that in *Abrams,* unlike the present situation the claimed process could *only* be performed in the mind, so far as was apparent from the specification. The *Abrams* situation may thus be distinguished from that presently before us, in which there is adequate disclosure how the process can be performed without mental calculation. This distinction from *Abrams* leads us to our present holding which is that patent protection for a process disclosed as being a sequence or combination of steps, capable of performance without human intervention and directed to an industrial technology—a "useful art" within the intendment of the Constitution—is not precluded by the mere fact that the process could alternatively be carried out by mental steps.

In view of this holding, the rejection of the process claims under 35 U.S.C. §§ 101 and 102 is reversed.

*The rejection under 35 U.S.C. §§ 101 and 112*

It is clear from their application that appellants' claims read upon and are adequately supported by the specification for the purpose of 35 U.S.C. § 112. The possibility that the claims also read on the same process performed mentally does not negate this for the reasons previously discussed in more detail concerning the rejection under 35 U.S.C. §§ 101 and 102. The rejection of the process claims under 35 U.S.C. §§ 101 and 112 is therefore also reversed.

## THE APPARATUS CLAIM

We also find the rejection of apparatus claim 10 to be untenable. Having reversed the rejection of the process claims, it would certainly be an anomaly to decide that the apparatus for carrying out the method, which the board found to be a substantial apparatus counterpart of process claim 17, was not patentable when no reference has been relied upon. To do otherwise would also, in our opinion, be contrary to the liberalized intention expressed by the third paragraph of 35 U.S.C. § 112.

In addition, we find it impossible to sustain a section 103 rejection in a situation where no reference has been cited and where the rejection inherently assumes the availability of applicants' admittedly novel contribution as knowledge available to one skilled in the art. Such an assumption is apparently at the heart of the examiner's proposed obviousness rejection wherein it is claimed that it would be obvious to program a general purpose digital computer to one *knowing of appellants' discovery.*

For the reasons discussed in this opinion, we reverse the rejection of all the claims before us.

Reversed.

KIRKPATRICK, J., concurs in the result.

WORLEY, Chief Judge:

This appeal was argued May 9, 1968, and assigned to Judge Smith to write the opinion for the court. Although Judge Smith had been strongly advised by his doctors to restrict his activities, he continued, with the wholehearted dedication so typical of him, to rewrite and revise an opinion dealing with one of the most technical-legal matters ever appealed to this court. Finally he was satisfied with his work, and was joined by two other members of the court November 8, 1968, constituting the majority necessary to a decision. Judge Smith died November 20.

Unfortunately, circumstances prevented my becoming as conversant with the details and issues as apparently has the majority. Under such circumstances, while I do not presently feel qualified to participate in the merits of the decision, but rather than delay so important a holding, written by such an able and distinguished judge, and awaited by so many as a landmark case in patent law, I join my colleagues in handing down the opinion today.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN and KIRK-PATRICK, Judges.*

## ON PETITION FOR REHEARING

Petition granted.

Judge RICH dissenting with opinion, with whom Judge ALMOND joins.

RICH, Judge, dissenting from the grant of the petition, with whom Judge ALMOND joins.

The Petition for Rehearing, filed by the Patent Office, should be denied. None of the reasons advanced for granting shows compliance with our rule on rehearings. In effect, as hereinafter explained, our four-to-nothing opinion *is*

the result of a careful *reconsideration* of an earlier opinion, which is equivalent to a rehearing.

Rehearing at this time can serve only to foster uncertainty in the law, to encourage the Patent Office in its policy of refusing to follow what this reviewing court has now declared the law to be and to have been, at least since 1952, and to prolong the controversy about what the law is.

A major function of courts, be they right or wrong, is to settle disputes about the law one way or the other. Of course, even after decision, the debate may continue and there will always be those who disagree with the conclusion the court has reached; but it is not proper for a court, on a relatively simple question of statutory interpretation like this one, to further the debate by vacillation once it has rendered its decision without a single dissent.

### I. *The Rule*

The only reason justifying the grant of rehearing is that the court has *overlooked* or *misapprehended* something. Our Rule 7, entitled "REHEARINGS," which here controls, reads in pertinent part:

The petition in each case shall be confined to a brief statement of points supposed to have been overlooked or misapprehended by the court, with proper references to the particular portion of the transcript of the record or original briefs relied upon, and with authorities and suggestions, concisely stated, in support of the points.

The Patent Office has not filed such a petition. Its petition, which is most disrespectful in tone, charges us generally with *ignoring* [1] and overlooking "important issues" and "prior adjudications of this court and others, including the Supreme Court." [2] More particularly, we

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. This word carries the connotation of deliberate action.

2. It is, of course, the duty of the Patent Office Solicitor, who is saying this, to call the court's attention to any "adjudications," that is to say cases, on which he relies. We have not overlooked but

are charged with "Completely disregard-[ing]" the holdings in certain of our own prior cases. In the guise of demanding by way of a rehearing, "the right to know why these pronouncements are ignored," [3] the solicitor is merely asking for further explanation of why we has refused to adopt *his* desired interpretation of some of our own utterances. The simple answer is that we did not agree with his desired interpretation. The reasons were fully developed in our opinion.

In the event the solicitor is unable to reconcile what we have said in this case with what the court has said in some older cases, the time has come to repeat once more the words of Judge Smith, as quoted by Judge Almond in In re Riden, 318 F.2d 761, 50 CCPA 1411, 1415.

> We * * * caution again against the tendency "to freeze into * * * rules of general application what, at best, are statements applicable to particular fact situations." [Citing Judge Smith's opinion in In re Mills, 281 F.2d 218, 47 CCPA 1185, 1190].

This has been stated many times by many judges in many different ways as a fundamental of American jurisprudence but zealous advocates have to be constantly reminded of the truism that

opinions are written to explain the decisions in particular cases and must be construed in that light. The reasoning on one fact situation is not applicable to utterly different facts; much less are the particular statements applicable.

The solicitor's next point is that we failed to realize that the appealed claims "are not commensurate with the designated holding or principle set by the majority." [4] Since the opinion itself contains a detailed consideration of the claims, the implication here is that we lack the capacity to construe patent claims. This is a matter frequently involved in patent appeals and one on which we do not always see eye-to-eye with the Patent Office.

Finally, the solicitor makes an argument to the effect that we have authorized the granting of a patent which would "confer upon a patentee the right to exclude others from thinking in a certain manner." This, we are told, would make the patent statutes, as we have construed them, unconstitutional as in violation of the First Amendment.[5] This is an entirely new proposition, never suggested before in this case, and is thus entirely improper on a petition for rehearing. Moreover, as counsel for Prater point out, in furthering this argument the Patent Office has deliberate-

have carefully studied any cases he cited, as our opinion shows on its face, and many more besides. His real complaint is that we have not *agreed* with the interpretations he has placed on prior cases as a matter of law, including naive attempts to elevate certain obiter dicta, and even arguments of counsel quoted in opinions, into binding rules of law in a field of technology never dreamed of when the dicta were uttered in other contexts.

3. See note 1.

4. The Patent Office petition consistently describes with considerable reiteration, the members of the court joining the decision as "the majority," a term usually implying that there was a dissent, or a minority taking a different view. Readers are cautioned to remember that there has been neither a dissent nor a minority opinion in this case. The only justification for calling the four-to-nothing court

a "majority" resides in the failure of the Chief Judge to participate on the ground that he did "not presently feel qualified to participate in the merits of the decision * * *."

5. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."
The Patent Office brief in support of the petition for rehearing cites Thomas v. Collins, 323 U.S. 516, 531, 65 S.Ct. 315, 323, 89 L.Ed. 430, for the statement that, "The First Amendment gives freedom of mind the same security as freedom of conscience." It then argues that Prater and Wei's patent will inhibit "freedom of secular thought."

ly misquoted from Prater's brief by the omission of a qualifying introduction to a sentence, turning it into an alleged admission of something Prater did not admit with respect to the scope of a claim. We did not sanction claims which would preclude people from thinking, Prater did not ask for such claims, and surely no court would ever place such a construction on the claims which were before us. Their construction by the Patent Office is therefore an improper construction. Prater's statement, in objecting to the petition, is that "There is no such thing as mental infringement" and that "thought is still unpatentable." This is unquestionably true.

So much for the nature of the petition and why it fails, under our Rule, to point out any ground on which we can properly grant the petition.

## II. *The Case Has Already Been Reconsidered*

The second point is that this case has already been as thoroughly considered as a case can be, including full-scale reconsideration and revision of an earlier "majority" opinion of Judge Smith.

In fairness to other litigants in this court, with its *growing* backlog, no more judicial man-hours should be expended on this case, especially when we are short a judge by reason of Judge Smith's death and when we have already cut back by five cases a month the cases planned to be heard in the two months of December and January on account of it.

In a statement which he appended to Judge Smith's opinion, the Chief Judge has already made known that this case was argued eight months ago, on May 9, 1968, and that Judge Smith wrote an earlier opinion which he revised and rewrote, the *final* version having been adopted by a majority on November 8, 1968.

After court convened for the October hearings and while they were in progress, Judge Smith initiated, about October 10, steps to obtain the views of all members of the court, and the supporting legal staff, as to how his earlier opinion, done on July 5, 1968, might be improved and revised so as to meet with general approval. Views having been collected from various sources, a concentrated effort was put into a revision over the course of about two weeks preceding November 8, when it was completed except for the inevitable minor corrections. It was in final form and sent to the reproduction department for final run on November 15 and was therefore a decided case in condition to be handed down, awaiting only decision by the other two out of the five judges [6] as to the position they wished to take when Judge Smith quite unexpectedly died.

Like many of our opinions, this one in particular was not altogether the work of one man. It was checked by many technically and legally competent hands, with which the court is equipped—at least a half dozen beside the three judges who joined in it.

Anyone who knows how opinions are produced, revised, checked, and finally handed down will realize that in this case, where it was in process for six months and reviewed in five chambers, many of which contributed to it, it is not likely that anything was overlooked or misapprehended.

## III. *The Issue is Not Complex*

It has been suggested that this case is one of the most complicated, technically and legally, with which we have ever had to deal. This is not so. While the technology is perhaps mathematically awesome, the economic impact of our decision tremendous, and the administrative problems of the Patent Office horrendous if it is obliged to abide by our decision, the case really boils down

---

6. For reasons of personal tragedy Judge Kirkpatrick was not able to consider the final opinion between the time he re- ceived a copy of 'it and the time it was handed down on November 20, the day of Judge Smith's death.

to a simple question or two of law. The technology is not as bad as many of our cases. Some have approached this case as though we were obliged to decide a momentous question of public policy: *should* computer programs be patentable? That is the problem the Patent Office presented to Congress, where the question belongs, submitting a bill implementing the recommendation of the President's Patent Commission that they be declared to be not patentable. But we are not at all concerned with what ought to be. We are not a policy-making body but a court of law. The simple question which has been before us is whether appellants' claimed process and apparatus are patentable *under the existing statutes.*

The statutes (35 U.S.C. §§ 101, 102, 103, and 112) are those with which we most commonly deal day in and day out. A relatively few prior decisions were relied on by the Patent Office to support its rejection—about a half dozen. If the decision is a "landmark" it is not because of its difficulty but because of its potential economic importance. While that may make us cautious, it does not make our task difficult; nor does it add any complexity. We have thoroughly considered the statutes, the cases, and the arguments and we have rendered our decision to the best of our ability. If we go through the process again, we can do no more. There has been no disagreement expressed of record on the court.

### IV. *Proper Judicial Administration Calls for Denial of the Petition*

We have already given this case a disproportionate number of judicial man-hours. Judge Smith devoted most of his time to it for the last two months of his life, in addition to the time spent at the end of last term preparing the first opinion. The backlog of this court is growing and so is our disposal time. We have cut back on our planned hearings by 20% since Judge Smith died. We owe it to the other litigants and to the judicial system to get on with our

work. Under the circumstances above outlined, proper administration of the court's business alone dictates that we should deny the requested rehearing.