MAYER, Circuit Judge,
dissenting.
The en banc order in this case asked: “Whether it is appropriate to reconsider State Street Bank & Trust Co. v. Signature Financial Group, Inc., 149 F.3d 1368 (Fed.Cir.1998), and AT & T Corp. v. Excel Communications, Inc., 172 F.3d 1352 (Fed.Cir.1999), in this case and, if so, whether those cases should be overruled in any respect?” I would answer that question with an emphatic “yes.” The patent system is intended to protect and promote advances in science and technology, not ideas about how to structure commercial transactions. Claim 1 of the application of Bernard L. Bilski and Rand A. Warsaw (“Bilski”) is not eligible for patent protection because it is directed to a method of conducting business. Affording patent protection to business methods lacks constitutional and statutory support, serves to hinder rather than promote innovation and usurps that which rightfully belongs in the public domain. State Street and AT & T should be overruled.
I.
In discussing the scope of copyright protection, the Supreme Court has noted that “ ‘a page of history is worth a volume of logic.’ ” Eldred v. Ashcroft, 537 U.S. 186, 200, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (quoting New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921)). The same holds true with respect to patent protection. From a historical perspective, it is highly unlikely that the framers of the Constitution’s intellectual property clause intended to grant patent protection to methods of conducting business. To the contrary, “those who formulated the Constitution were familiar with the long struggle over monopolies so prominent in English history, where exclusive rights to engage even in ordinary business activities were granted so frequently by the Crown for the financial benefits accruing to the Crown only.” In re Yuan, 38 C.C.P.A. 967, 188 F.2d 377, 380 (1951). The Statute of Monopolies,[1] enacted in 1624, curtailed the Crown’s ability to grant “monopolies to court favorites in goods or businesses which had long before been enjoyed by the public.” Graham v. John Deere Co., 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). When drafting the Constitution, the framers were well aware of the abuses that led to the English Statute of Monopolies and therefore “consciously acted to bar Congress from granting letters patent in particular types of business.” In re Comiskey, 499 F.3d 1365, 1375 (Fed.Cir.2007); see also Malla Pollack, The Multiple Unconstitutionality of Business Method Patents: Common Sense, Congressional Consideration, and Constitutional History, 28 Rutgers Computer & Tech. L.J. 61, 90 (2002) (“[T]he ratifying generation did not agree to invention patents on advances in *999 trade itself, because trade monopolies were odious.”).
There is nothing in the early patent statutes to indicate that Congress intended business methods to constitute patentable subject matter. See Patent Act of 1790 § 4, 1 Stat. 109, 111 (1790); Patent Act of 1793 § 1, 1 Stat. 318, 319 (1793); Pollack, supra at 106 (“[I]f any nation was ripe for invention patents on business methods, it was the newly freed colonies of British North America.... [Hjowever, no business method patents seem to have been granted.”). As early as 1869, the Commissioner of Patents said that “[i]t is contrary ... to the spirit of the law, as construed by the office for many years, to grant patents for methods of book-keeping,” Ex parte Abraham, 1869 Dec. Comm’r Pat. 59, 59 (1869), and by 1893 the courts had concluded that “a method of transacting common business ... does not seem to be patentable as an art,” United States Credit Sys. Co. v. Am. Credit Indem. Co., 53 F. 818, 819 (C.C.S.D.N.Y.1893), aff'd on other grounds, 59 F. 139 (2d Cir.1893). By 1952, when Congress enacted the current Patent Act, it was widely acknowledged that methods of doing business were ineligible for patent protection. See, e.g., Loew’s Drive-In Theatres, Inc. v. Park-In Theatres, Inc., 174 F.2d 547, 552 (1st Cir.1949) (“[A] system for the transaction of business ... however novel, useful, or commercially successful is not patentable apart from the means for making the system practically useful, or carrying it out.”); In re Patton, 29 C.C.P.A. 982, 127 F.2d 324 (1942) (noting that “a system of transacting business, apart from the means for carrying out such system” is not patentable); Hotel Sec. Checking Co. v. Lorraine Co., 160 F. 467, 469 (2d Cir.1908) (“A system of transacting business disconnected from the means for carrying out the system is not, within the most liberal interpretation of the term, an art.”); In re Moeser, 27 App. D.C. 307, 310 (1906) (holding that a system for burial insurance contracts was not patentable because “contracts or proposals for contracts, devised or adopted as a method of transacting a particular class of ... business, [are] not patentable as an art”); see also 145 Cong. Rec. H6,947 (Aug. 3, 1999) (statement of Rep. Manzullo) (“Before the State Street Bank and Trust case ... it was universally thought that methods of doing or conducting business were not patentable items.”).
In passing the 1952 Act, Congress reenacted statutory language that had long existed,[2] thus signaling its intent to carry forward the body of case law that had developed under prior versions of the statute. Because there is nothing in the language of the 1952 Act, or its legislative history, to indicate that Congress intended to modify the rule against patenting business methods, we must presume that no change in the rule was intended. See, e.g., Astoria Fed. Sav. & Loan Ass’n v. Solimino, 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (“[W]here a common-law principle is well established ... the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.” (citations and internal quotation marks omitted)); Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952) (“Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established *1000 and familiar principles, except when a statutory purpose to the contrary is evident.”); see also In re Schrader, 22 F.3d 290, 295 (Fed.Cir.1994) (“When Congress approved the addition of the term ‘process’ to the categories of patentable subject matter in 1952, it incorporated the definition of ‘process’ that had evolved in the courts.” (footnote omitted)). If Congress had wished to change the established practice of disallowing patents on business methods, it was quite capable of doing so explicitly. See Parker v. Flook, 437 U.S. 584, 596, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (stressing that courts “must proceed cautiously when ... asked to extend patent rights into areas wholly unforeseen by Congress”).
State Street’s decision to jettison the prohibition against patenting methods of doing business contravenes congressional intent. Because (1) “the framers consciously acted to bar Congress from granting letters patent in particular types of business,” Comiskey, 499 F.3d at 1375, and (2) Congress evidenced no intent to modify the long-established rule against business method patents when it enacted the 1952 Patent Act, it is hard to fathom how the issuance of patents on business methods can be supported.
II.
Business method patents have been justified, in significant measure, by a misapprehension of the legislative history of the 1952 Patent Act. In particular, proponents of such patents have asserted that the Act’s legislative history states that Congress intended statutory subject matter to “include anything under the sun that is made by man.” AT & T, 172 F.3d at 1355 (Fed.Cir.1999) (citations and internal quotation marks omitted); see also Diamond v. Chakrabarty, 447 U.S. 303, 309, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). Read in context, however, the legislative history says no such thing. The full statement from the committee report reads: “A person may have ‘invented’ a machine or a manufacture, which may include anything under the sun that is made by man, but it is not necessarily patentable under section 101 unless the conditions of the title are fulfilled.” S.Rep. No.1979, 82d Cong., 2d Sess. 5 (1952), U.S.Code Cong. & Admin.News 1952, pp. 2394, 2399 (emphasis added); H.R.Rep. No.1923, 82d Cong., 2d Sess. 6 (1952) (emphasis added).
This statement does not support the contention that Congress intended “anything under the sun” to be patentable. To the contrary, the language supports the opposite view: a person may have “invented” anything under the sun, but it is “not necessarily patentable” unless the statutory requirements for patentability have been satisfied. Thus, the legislative history oft-cited to support business method patents undercuts, rather than supports, the notion that Congress intended to extend the scope of section 101 to encompass such methods.
Moreover, the cited legislative history is not discussing process claims at all. The quoted language is discussing “machines” and “manufactures;” it is therefore surprising that it has been thought a fit basis for allowing patents on business processes.
III.
The Constitution does not grant Congress unfettered authority to issue patents. See U.S. Const, art. I, § 8.[3] Instead, the *1001 patent power is a “qualified authority ... [which] is limited to the promotion of advances in the ‘useful arts.’ ” Graham, 383 U.S. at 5, 86 S.Ct. 684; see also KSR Int’l Co. v. Teleflex Inc., 550 U.S. 398, 127 S.Ct. 1727, 1746, 167 L.Ed.2d 705 (2007) (reaffirming that patents are designed to promote “the progress of useful arts”). What the framers described as “useful arts,” we in modern times call “technology.” Paulik v. Rizkalla, 760 F.2d 1270, 1276 (Fed.Cir. 1985) (en banc). Therefore, by mandating that patents advance the useful arts, “[t]he Constitution explicitly limited patentability to ... ‘the process today called technological innovation.’” Comiskey, 499 F.3d at 1375 (quoting Paulik, 760 F.2d at 1276); see also In re Foster, 58 C.C.P.A. 1001, 438 F.2d 1011 (1971) (“All that is necessary ... to make a sequence of operational steps a statutory ‘process’ within 35 U.S.C. § 101 is that it be in the technological arts.”); Karl B. Lutz, Patents and Science: A Clarification of the Patent Clause of the U.S. Constitution, 18 Geo. Wash. L.Rev. 50, 54 (1949) (“The term ‘useful arts’ as used in the Constitution ... is best represented in modern language by the word ‘technology.’ ”); James S. Sfekas, Controlling Business Method Patents: How the Japanese Standard for Patenting Software Could Bring Reasonable Limitations to Business Method Patents in the United States, 16 Pac. Rim. L. & Pol’y J. 197, 214 (2007) (At the time the Patent Clause was adopted, “the term ‘useful arts’ was commonly used in contrast to the ideas of the ‘liberal arts’ and the ‘fine arts,’ which were well-known ideas in the eighteenth century.”).
Before State Street led us down the wrong path, this court had rightly concluded that patents were designed to protect technological innovations, not ideas about the best way to run a business.[4] We had *1002 thus rejected as unpatentable a method for coordinating firefighting efforts, Patton, 127 F.2d at 326-27, a method for deciding how salesmen should best handle customers, In re Maucorps, 609 F.2d 481 (CCPA 1979), and a computerized method for aiding a neurologist in diagnosing patients, In re Meyer, 688 F.2d 789 (CCPA 1982).[5] We stated that patentable processes must “be in the technological arts so as to be in consonance with the Constitutional purpose to promote the progress of ‘useful arts.’ ” In re Musgrave, 57 C.C.P.A. 1352, 431 F.2d 882, 893 (CCPA 1970) (emphasis added).
Business method patents do not promote the “useful arts” because they are not directed to any technological or scientific innovation. Although business method applications may use technology — such as computers — to accomplish desired results, the innovative aspect of the claimed method is an entrepreneurial rather than a technological one. Thus, although Bilski’s claimed hedging method could theoretically be implemented on a computer, that alone does not render it patentable. See Diehr, 450 U.S. at 192 n. 14, 101 S.Ct. 1048 (Patentability cannot be established by the “token” use of technology.); Gottschalk v. Benson, 409 U.S. 63, 64-66, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) (finding unpatentable a method of programming a general purpose digital computer to convert signals from binary-coded decimal to pure binary form). Where a claimed business method simply uses a known machine to do what it was designed to do, such as using a computer to gather data or perform calculations, use of that machine will not bring otherwise unpatentable subject matter within the ambit of section 101. See Benson, 409 U.S. at 67, 93 S.Ct. 253 (finding a process unpatentable where “[t]he mathematical procedures [could] be carried out in existing computers long in use, no new machinery being necessary”).
Although the Supreme Court has not directly addressed the patentability of business methods, several of its decisions implicitly tether patentability to technological innovation. See Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998) (“[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.” (emphasis added)); Markman v. Westview Instruments, Inc., 517 U.S. 370, 390, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (“Congress created the Court of Appeals for the Federal Circuit as an exclusive appellate court for patent cases ... observing that increased uniformity would strengthen the United States patent system in such a way as to foster technological growth and industrial innovation.” (citations and internal quotation marks omitted) (emphasis added)); Benson, 409 U.S. at 71, 93 S.Ct. 253 (refusing to “freeze [the patentability *1003 of] process patents to old technologies, leaving no room for the revelations of the new, onrushing technology ” (emphases added)). Indeed, the Supreme Court has repeatedly emphasized that what renders subject matter patentable is “the application of the law of nature to a new and useful end.” Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948); see Diehr, 450 U.S. at 188 n. 11, 101 S.Ct. 1048; Benson, 409 U.S. at 67, 93 S.Ct. 253.[6]Applying laws of nature to new and useful ends is nothing other than “technology.”[7] See, e.g., Microsoft Computer Dictionary 513 (5th ed. 2002) (The definition of “technology” is the “application of science and engineering to the development of machines and procedures in order to enhance or improve human conditions.”); American Heritage Dictionary of the English Language 1777 (4th ed. 2000) (“Technology” is the “application of science, especially to industrial or commercial objectives.”); see also Sfekas, supra at 214-15 (“The [Supreme] Court’s holdings in Benson and Diehr are really stating a requirement that inventions must be technological.”); Schwartz, supra at 357 (The “clear and consistent body of Supreme Court case law establishes that the term ‘invention’ encompasses anything made by man that utilizes or harnesses one or more ‘laws of nature’ for human benefit.”). As the Supreme Court has made clear, “the act of invention ... consists neither in finding out the laws of nature, nor in fruitful research as to the operation of natural laws, but in discovering how those laws may be utilized or applied for some beneficial purpose, by a process, a device or a machine.” United States v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S.Ct. 554, 77 L.Ed. 1114 (1933).
Methods of doing business do not apply “the law of nature to a new and useful end.” Because the innovative aspect of such methods is an entrepreneurial rather than a technological one, they should be deemed ineligible for patent protection. See, e.g., John R. Thomas, The Patenting of the Liberal Professions, 40 B.C. L.Rev. 1139 (1999) (arguing that affording patent-ability to business methods opens the door to obtaining patent protection for all aspects of human thought and behavior, and that patents should remain grounded in science and technology) (hereinafter “Thomas (1999)”). “[T]he primary purpose of our patent laws is not the creation of private fortunes for the owners of patents but is ‘to promote the progress of science and useful arts.’ ” Motion Picture *1004 Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 511, 37 S.Ct. 416, 61 L.Ed. 871 (1917). Although business method patents may do much to enrich their owners, they do little to promote scientific research and technological innovation.
IV.
State Street has launched a legal tsunami, inundating the patent office with applications seeking protection for common business practices.[8] Applications for Class 705 (business method) patents increased from fewer than 1,000 applications in 1997 to more than 11,000 applications in 2007. See United States Patent and Trademark Office, Class 705 Application Filings and Patents Issued Data, available at http:// www.uspto.gov/web/menu/pbmethod/ applicationfiling.htm (information available as of Jan. 2008); see Douglas L. Price, Assessing the Patentability of Financial Services and Products, 3 J. High Tech. L. 141, 153 (2004) (“The State Street case has opened the floodgates on business method patents.”).
Patents granted in the wake of State Street have ranged from the somewhat ridiculous to the truly absurd. See, e.g., U.S. Patent No. 5,851,117 (method of training janitors to dust and vacuum using video displays); U.S. Patent No. 5,862,223 (method for selling expert advice); U.S. Patent No. 6,014,643 (method for trading securities); U.S. Patent No. 6,119,099 (method of enticing customers to order additional food at a fast food restaurant); U.S. Patent No. 6,329,919 (system for toilet reservations); U.S. Patent No. 7,255,-277 (method of using color-coded bracelets to designate dating status in order to limit “the embarrassment of rejection”). There has even been a patent issued on a method for obtaining a patent. See U.S. Patent No. 6,049,811. Not surprisingly, State Street and its progeny have generated a thundering chorus of criticism. See Leo J. Raskind, The State Street Bank Decision: The Bad Business of Unlimited Patent Protection for Methods of Doing Business, 10 Fordham Intell. Prop. Media & Ent. L.J. 61, 61 (1999) (“The Federal Circuit’s recent endorsement of patent protection for methods of doing business marks so sweeping a departure from precedent as to invite a search for its justification.”); Pollack, supra at 119-20 (arguing that State Street was based upon a misinterpretation of both the legislative history and the language of section 101 and that “business method patents are problematical both socially and constitutionally”); Price, supra at 155 (“The fall out from State Street has created a gold-rush mentality toward patents and litigation in which companies .... gobble up patents on anything and everything.... It is a mad rush to get as many dumb patents as possible.” (citations and internal quotation marks omitted)); Thomas (1999), supra at 1160 (“After State Street, it is hardly an exaggeration to say that if you can name it, you can claim it.”); Sfekas, supra at 226 (“[T]he U.S. courts *1005 have set too broad a standard for patenting business methods.... These business method patents tend to be of lower quality and are unnecessary to achieve the goal of encouraging innovation in business.”); William Krause, Sweeping the E-Commerce Patent Minefield: The Need for a Workable Business Method Exception, 24 Seattle U.L.Rev. 79, 101 (2000) (State Street “opened up a world of unlimited possession to anyone quick enough to take a business method and put it to use via computer software before anyone else.”); Moy, supra at 1051 (“To call [the situation following State Street ] distressing is an understatement. The consensus ... appears to be that patents should not be issuing for new business methods.”).
There are a host of difficulties associated with allowing patents to issue on methods of conducting business. Not only do such patents tend to impede rather than promote innovation, they are frequently of poor quality. Most fundamentally, they raise significant First Amendment concerns by imposing broad restrictions on speech and the free flow of ideas.
A.
“[T]he underlying policy of the patent system [is] that ‘the things which are worth to the public the embarrassment of an exclusive patent,’ ... must outweigh the restrictive effect of the limited patent monopoly.” Graham, 383 U.S. at 10-11, 86 S.Ct. 684 (quoting letter from Thomas Jefferson to Isaac McPherson (Aug. 1813)). Thus, Congress may not expand the scope of “the patent monopoly without regard to the ... advancement or social benefit gained thereby.” Id. at 6, 86 S.Ct. 684.
Patents should be granted to those inventions “which would not be disclosed or devised but for the inducement of a patent.” Id. at 11, 86 S.Ct. 684. Methods of doing business have existed since the earliest days of the Patent Act and have flourished even in the absence of patent protection. See Brian P. Biddinger, Limiting the Business Method Patent: A Comparison and Proposed Alignment of European, Japanese and United States Patent Law, 69 Fordham L.Rev. 2523, 2544-50 (2001). Commentators have argued that “the broad grant of patent protection for methods of doing business is something of a square peg in a sinkhole of uncertain dimensions” since “[n]owhere in the substantial literature on innovation is there a statement that the United States economy suffers from a lack of innovation in methods of doing business.” Raskind, supra at 92-93. Instead, “the long history of U.S. business is one of innovation, emulation, and innovation again. It also is a history of remarkable creativity and success, all without business method patents until the past few years.” Smith, supra at 178; see also Sfekas, supra at 213 (“While innovation in business methods is a good thing, it is likely that there would be the same level of innovation even without patents on [such methods].”).
Business innovations, by their very nature, provide a competitive advantage and thus generate their own incentives. See Xiang, supra at 813 (“A business entity improves the way it does business in order to be more effective and efficient, to stay ahead of [the] competition, and to make more profit.”). The rapid “growth of fast food restaurants, self-service gasoline stations, quick oil change facilities ... automatic teller devices ... and alternatives for long-distance telephone services” casts real doubt about the need for the additional incentive of patent protection in the commercial realm. Raskind, supra at 93.
Although patents are not a prerequisite to business innovation, they are of undeniable importance in promoting technological advances. For example, the pharmaceuti *1006 cal industry relies on patent protection in order to recoup the large sums it invests to develop life-saving and life-enhancing drugs:
[T]he “fully loaded” cost of developing a single new pharmaceutical molecule, taking it though laboratory and clinical trials, and securing FDA approval for its marketing is today about $800 million (including the cost of project failures). Furthermore, fewer than one in five drug candidates that make it out of the laboratory survive this tortuous process and reach the marketplace in the form of FDA-approved pharmaceuticals.... Only patent protection can make the innovator’s substantial investment in development and clinical testing economically rational.
Jay Dratler, Jr., Alice in Wonderland Meets the U.S. Patent System, 38 Akron L.Rev. 299, 313-14 (2005) (footnotes omitted).
Business method patents, unlike those granted for pharmaceuticals and other products, offer rewards that are grossly disproportionate to the costs of innovation. In contrast to technological endeavors, business innovations frequently involve little or no investment in research and development. Bilski, for example, likely spent only nominal sums to develop his hedging method. The reward he could reap if his application were allowed — exclusive rights over methods of managing risks in a wide array of commodity transactions — vastly exceeds any costs he might have incurred in devising his “invention.”
B.
“[Sjometimes too much patent protection can impede rather than ‘promote the Progress of Science and useful Arts,’ the constitutional objective of patent and copyright protection.” Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 548 U.S. 124, 126, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006) (Breyer, J., joined by Stevens and Souter, JJ., dissenting from dismissal of writ of certiorari) (emphasis in original). This is particularly true in the context of patents on methods of conducting business. Instead of providing incentives to competitors to develop improved business techniques, business method patents remove building blocks of commercial innovation from the public domain. Dreyfuss, supra at 275-77. Because they restrict competitors from using and improving upon patented business methods, such patents stifle innovation. When “we grant rights to exclude unnecessarily, we ... limit competition with no quid pro quo. Retarding competition retards further development.” Pollack, supra at 76. “Think how the airline industry might now be structured if the first company to offer frequent flyer miles had enjoyed the sole right to award them or how differently mergers and acquisitions would be financed ... if the use of junk bonds had been protected by a patent.” Dreyfuss, supra at 264. By affording patent protection to business practices, “the government distorts the operation of the free market system and reduces the gains from the operation of the market.” Sfekas, supra at 214.
It is often consumers who suffer when business methods are patented. See Ras-kind, supra at 82. Patented products are more expensive because licensing fees are often passed on to consumers. See Lois Matelan, The Continuing Controversy Over Business Method Patents, 18 Ford-ham Intell. Prop. Med. & Ent. L.J. 189, 201 (2007). Further, as a general matter, “quantity and quality [of patented products] are less than they would be in a competitive market.” Dreyfuss, supra at 275.
*1007 Patenting business methods makes American companies less competitive in the global marketplace. American companies can now obtain exclusionary rights on methods of conducting business, but their counterparts in Europe and Japan generally cannot. See Biddinger, supra at 25464U. Producing products in the United States becomes more expensive because American companies, unlike their overseas counterparts, must incur licensing fees in order to use patented business methods:
[0]nce a United States patent application for a new method of doing business becomes publicly available, companies in Europe and Japan may begin using the method outside the United States, while American companies in competition with the patentee would be unable to use the method in the United States without incurring licensing fees. The result is that companies outside of the United States receive the benefit of the novel method without incurring either the research and development costs of the inventor, or the licensing fees of the pat-entee’s American competitors.
Id. at 2545-46.
C.
Another significant problem that plagues business method patents is that they tend to be of poor overall quality. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 397, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (Kennedy, J., joined by Stevens, Souter, and Breyer, JJ., concurring) (noting the “potential vagueness and suspect validity” of some of “the burgeoning number of patents over business methods”). Commentators have lamented “the frequency with which the Patent Office issues patents on shockingly mundane business inventions.” Dreyfuss, supra at 268; see also Pollack, supra at 106 (“[Mjany of the recently-issued business method patents are facially (even farcically) obvious to persons outside the USP-TO.”). One reason for the poor quality of business method patents is the lack of readily accessible prior art references. Because business methods were not patentable prior to State Street, “there is very little patent-related prior art readily at hand to the examiner corps.” Dreyfuss, supra at 269.
Furthermore, information about methods of conducting business, unlike information about technological endeavors, is often not documented or published in scholarly journals. See Russell A. Korn, Is Legislation the Answer? An Analysis of the Proposed Legislation for Business Method Patents, 29 Fla. St. U.L.Rev. 1367, 1372-73 (2002). The fact that examiners lack the resources to weed out undeserving applications “has led to the improper approval of a large number of patents, leaving private parties to clean up the mess through litigation.” Krause, supra at 97.
Allowing patents to issue on business methods shifts critical resources away from promoting and protecting truly useful technological advances. As discussed previously, the patent office has been deluged with business method applications in recent years. Time spent on such applications is time not spent on applications which claim true innovations. When already overburdened examiners are forced to devote significant time to reviewing large numbers of business method applications, the public’s access to new and beneficial technologies is unjustifiably delayed.
D.
Patenting business methods allows private parties to claim exclusive ownership of ideas and practices which rightfully belong in the public domain. “It is a matter of public interest that [economic] decisions, in the aggregate, be intelligent and well *1008 informed. To this end, the free flow of commercial information is indispensable.” Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 765, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Thus, “the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.” Ar-onson v. Quick Point Pencil Co., 440 U.S. 257, 262, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979).
Bilski’s claimed method consists essentially of two conversations. The first conversation is between a commodity provider and a commodity consumer, while the second conversation is between the provider and “market participants” who have “a counter-risk position to ... consumers.” His claims provide almost no details as to the contents of these conversations.
Like many business method applications, Bilski’s application is very broadly drafted. It covers a wide range of means for “hedging” in commodity transactions. If his application were allowed, anyone who discussed ways to balance market risks in any sort of commodity could face potential infringement liability. By adopting overly expansive standards for patent-ability, the government enables private parties to impose broad and unwarranted burdens on speech and the free flow of ideas. See Thomas F. Cotter, A Burkean Perspective on Patent Eligibility, 22 Berkeley Tech. L.J. 855, 880-82 (2007) (arguing that overly expansive patent eligibility standards can result in the granting of patents that threaten free speech, privacy and other constitutionally-protected rights); John R. Thomas, The Future of Patent Law: Liberty and Property in the Patent Law, 39 Hous. L.Rev. 569, 589 (2002) (arguing that “the patent law allows private actors to impose more significant restraints on speech than has ever been possible through copyright”); see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of New York, 447 U.S. 557, 569-70, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (The First Amendment mandates that restrictions on free speech in commercial transactions be “no more extensive than necessary.”).
To the extent that business methods are deemed patentable, individuals can face unexpected potential infringement liability for everyday conversations and commercial interactions. “[IJmplicit in the Patent Clause itself [is the understanding] that free exploitation of ideas will be the rule, to which the protection of a federal patent is the exception.” Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 151, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). In the wake of State Street, too many patent holders have been allowed to claim exclusive ownership of subject matter that rightfully belongs in the public domain.
y.
The majority’s proposed “machine-or-transformation test” for patentability will do little to stem the growth of patents on non-technological methods and ideas. Quite simply, in the context of business method patent applications, the majority’s proposed standard can be too easily circumvented. See Cotter, supra at 875 (noting that the physical transformation test for patentability can be problematic because “[i]n a material universe, every process will cause some sort of physical transformation, if only at the microscopic level or within the human body, including the brain”). Through clever draftsmanship, nearly every process claim can be rewritten to include a physical transformation. Bilski, for example, could simply add a requirement that a commodity consumer install a meter to record commodity consumption. He could then argue that in *1009 stallation of this meter was a “physical transformation,” sufficient to satisfy the majority’s proposed patentability test.
Even as written, Bilski’s claim arguably involves a physical transformation. Prior to utilizing Bilski’s method, commodity providers and commodity consumers are not involved in transactions to buy and sell a commodity at a fixed rate. By using Bilski’s claimed method, however, providers and consumers enter into a series of transactions allowing them to buy and sell a particular commodity at a particular price. Entering into a transaction is a physical process: telephone calls are made, meetings are held, and market participants must physically execute contracts. Market participants go from a state of not being in a commodity transaction to a state of being in such a transaction. The majority, however, fails to explain how this sort of physical transformation is insufficient to satisfy its proposed patent eligibility standard.
The majority suggests that a technological arts test is nothing more that a “shortcut” for its machine-or-transformation test. Ante at 964. To the contrary, however, the two tests are fundamentally different. Consider U.S. Patent No. 7,261,652, which is directed to a method of putting a golf ball, U.S. Patent No. 6,368,227, which is directed to a method of swinging on a swing suspended on a tree branch, and U.S. Patent No. 5,443,036, which is directed to a method of “inducing cats to exercise.” Each of these “inventions” involves a physical transformation that is central to the claimed method: the golfer’s stroke is changed, a person on a swing starts swinging, and the sedentary cat becomes a fit feline. Thus, under the majority’s approach, each of these inventions is patent eligible. Under a technological arts test, however, none of these inventions is eligible for patent protection because none involves any advance in science or technology-[9]
Regardless of whether a claimed process involves a “physical transformation,” it should not be patent eligible unless it is directed to an advance in science or technology. See Benson, 409 U.S. at 64-71, 93 S.Ct. 253 (finding a process unpatentable even though it “transformed” binary-coded decimals into pure binary numbers using a general purpose computer). Although the Supreme Court has stated that a patentable process will usually involve a transformation of physical matter, see id. at 70, 93 S.Ct. 253, it has never found a process patent eligible which did not involve a scientific or technological innovation. See Diehr, 450 U.S. at 192-93, 101 S.Ct. 1048 (finding a process patentable where it involved new technology for curing rubber).
The majority refuses to inject a technology requirement into the section 101 analysis because it believes that the terms “technological arts” and “technology” are “ambiguous.” See ante at 960. To the contrary, however, the meaning of these terms is not particularly difficult to grasp. “The need to apply some sort of ‘technological arts’ criterion has hardly led other countries’ and regions’ patent systems to grind to a halt; it is hard to see why it should be an insurmountable obstacle for ours.” Cotter, supra at 885. As discussed more fully in section III, a claimed process is technological to the extent it applies laws of nature to new ends. See Benson, 409 U.S. at 67, 93 S.Ct. 253 (“ ‘If there is to be invention from ... a discovery, it *1010 must come from the application of the law of nature to a new and useful end.’ ” (quoting Funk Bros., 333 U.S. at 130, 68 S.Ct. 440)). By contrast, a process is non-technological where its inventive concept is the application of principles drawn not from the natural sciences but from disciplines such as business, law, sociology, or psychology. See Thomas (1999), supra at 1168 (“[F]ew of us would suppose that inventions within the domain of business, law or fine arts constitute technology, much less patentable technology.”). The inventive aspect of Bilski’s claimed process is the application of business principles, not laws of nature; it is therefore non-technological and ineligible for patent protection.
Unlike a technological standard for pat-entability, the majority’s proposed test will be exceedingly difficult to apply. The standard that the majority proposes for inclusion in the patentability lexicon— “transformation of any physical object or substance, or an electronic signal repre-sentatiye of any physical object or substance,” ante at 964 — is unnecessarily complex and will only lead to further uncertainty regarding the scope of patentable subject matter. As noted in In re Nuijten, 500 F.3d 1346, 1353 (Fed.Cir. 2007), defining the term “physical” can be an “esoteric and metaphysical” inquiry. Indeed, although this court has struggled for years to set out what constitutes sufficient physical transformation to render a process patentable, we have yet to provide a consistent or satisfactory resolution of this issue.
We took this case en banc in a long-overdue effort to resolve primal questions on the'metes and bounds of statutory subject matter. The patent system has run amok, and the USPTO, as well as the larger - patent community, has actively sought guidance from this court in making sense of our section 101 jurisprudence. See Supplemental Br. of Appellee at 3 (“[The Federal Circuit] should clarify the meaning of State Street and AT & T, as they have been too often misunderstood.”); Br. of Fin. Serv. Indus, at 1 (“The rise of [business method patents] in recent years has ... led to uncertainty over the scope of the patents granted and, more fundamentally, the definition of patentable subject matter itself. [We] seek a workable standard defining the scope of patentable subject matter, one that ... provides clear guidance to the Patent and Trademark Office ... and the public.”); Br. of Samuelson Law, Tech, and Public Policy Clinic at 1 (“Ever since State Street, the [USP-TO] has been flooded with applications for a wide variety of non-technological ‘inventions’ such as arbitration methods, dating methods, tax-planning methods, legal methods, and novel-writing methods. These applications have eroded public confidence in the patent system and driven up the cost and decreased the return for applicants seeking legitimate technological patents.” (footnote omitted)); Br. of Assoc, of Am. Medical Colleges at 29 (arguing that “broad swaths of the public and certain industry sectors” have lost respect for the patent system and that “[the Federal Circuit] should act, even if its actions mean unsettling the settled expectations of some”). The majority, however, fails to enlighten three of the thorniest issues in the patentability thicket: (1) the continued viability of business method patents, (2) what constitutes sufficient physical transformation or machine-implementation to render a process patentable, and (3) the extent to which computer software and computer-implemented processes constitute statutory subject matter. The majority’s “measured approach” to the section 101 analysis, see ante at 962, will do little to restore public confidence in the patent system or stem the growth of patents on *1011 business methods and other non-teehnological ideas.
VI.
Where the advance over the prior art on which the applicant relies to make his invention patentable is an advance in a field of endeavor such as law (like the arbitration method in Comiskey), business (like the method claimed by Bilski) or other liberal — as opposed to technological — arts, the application falls outside the ambit of patentable subject matter. The time is ripe to repudiate State Street and to recalibrate the standards for patent eligibility, thereby ensuring that the patent system can fulfill its constitutional mandate to protect and promote truly useful innovations in science and technology. I dissent from the majority’s failure to do so.

. The Statute of Monopolies "grew out of abuses in the grant of exclusive franchises in various lines of business such as trading cards, alehouses and various staple products.” Robert P. Merges, As Many as Six Impossible Patents Before Breakfast: Property Rights for Business Concepts and Patent System Refomi, 14 Berkeley Tech. L.J. 577, 585 (1999).

. Article I, § 8 provides that “The Congress shall have Power ... To promote the Progress of Science and useful Arts by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.” The patent power "is the only one of the several powers conferred upon the Congress which is accompanied by a *1001 specific statement of the reason for it.” Yuan, 188 F.2d at 380.

. "[Djespite the assertions in State Street and Schrader, very few in the patent community believe that business methods have always been patentable. To the contrary, the dominant view is that the law has changed, and that the definition of patentable subject matter is now wider than it once was.” R. Carl Moy, Subjecting Rembrandt to the Rule of Law: Rule-Based Solutions for Determining the Patentability of Business Methods, 28 Wm. Mitchell L.Rev. 1047, 1060 (2002) (footnotes omitted); see also Rochelle Cooper Dreyfuss, Are Business Method Patents Bad for Business?, 16 Santa Clara Computer & High Tech. L.J. 263, 265-66 (2000) (State Street gave "judicial recognition to business method patents.”). Over the course of two centuries, a few patents issued on what could arguably be deemed methods of doing business, see, e.g., U.S. Patent No. 5,664,115 ("Interactive Computer System to Match Buyers and Sellers of Real Estate, Businesses and Other Property Using the Internet”), but these patents were aberrations and the general rule, prior to State Street, was that methods of engaging in business were ineligible for patent protection. See Comiskey, 499 F.3d at 1374 (noting that "[a]t one time, '[tjhough seemingly within the category of process or method, a method of doing business [was] rejected as not being within the statutory classes.' ” (quoting State Street, 149 F.3d at 1377)). One commentator has noted that although the United States Patent and Trademark Office (“USPTO”) "in an attempt to deflect criticism [has] issued an apologia ... asserting that business method patents are as old as the United States patent system,” this document is fundamentally flawed. See Pollack, supra at 73-75. She explains:
The USPTO wants us to believe that it found no records of patents whose points of invention were business methods, because no one had time to invent any new business methods until the human race had run its mechanical ingenuity to the peak of computer software; seemingly we were all too busy inventing the computer to think about anything else — especially new ways of doing business. I thought that we granted patents because, otherwise, people would be too busy making money by running businesses to take time out to invent anything except business methods. The USPTO *1002 [document], furthermore, is eliding the printed matter exception to patentable subject matter with the business method exception.
Id. at 75 (footnote omitted).

. The claims in Patton were explicitly rejected on the basis that they were directed to a business method, while the claims in Mau-corps and Meyer were rejected as attempts to patent mathematical algorithms. Subsequently, however, this court stated that the claimed processes in Maucorps and Meyer were directed toward business systems and should therefore not be considered patent eligible. In re Alappat, 33 F.3d 1526, 1541 (Fed.Cir.1994) (en banc). We noted that "Maucorps dealt with a business methodology for deciding how salesmen should best handle respective customers and Meyer involved a 'system' for aiding a neurologist in diagnosing patients. Clearly, neither of the alleged ‘inventions’ in those cases falls within any § 101 category.” Id.

. Laws of nature are those laws pertaining to the "natural sciences," such as biology, chemistry, or physics. See, e.g., Webster’s New International Dictionary 1507 (3d ed. 2002) ("Natural sciences” are the "branches of science ([such] as physics, chemistry, [or] biology) that deal with matter, energy, and their interrelations and transformations or with objectively measured phenomena.”). They must be distinguished from other types of law, such as laws of economics or statutory enactments. Laws of nature do not involve "judgments on human conduct, ethics, morals, economics, politics, law, aesthetics, etc.” Musgrave, 431 F.2d at 890; see also Joy Y. Xiang, How Wide Should the Gate of “Technology” Be? Patenta-bility of Business Methods in China, 11 Pac. Rim L. & Pol’y J. 795, 807 (2002) (noting that State Street's " useful, concrete and tangible result' test is inconsistent with the ‘application of the law of nature’ patent eligibility scope outlined by the U.S. Supreme Court and [the Federal Circuit prior to State Street].").

. One commentator notes that both Japan and the Republic of Korea explicitly define an "invention” as the application of a law of nature, and argues that the United States should follow a similar approach to patenta-bility. See Andrew A. Schwartz, The Patent Office Meets the Poison Pill: Why Legal Methods Cannot be Patented, 20 Harv. J. Law & Tech. 333, 357 (2007).

. Congress has acted to ameliorate some of the negative effects of granting patents on methods of doing business. It passed the American Inventors Protection Act (commonly referred to as the First Inventor Defense Act) which provides an affirmative defense against a business method patent infringement action if the defendant “acting in good faith, actually reduced the subject matter to practice at least 1 year before the effective filing date of such patent, and commercially used the subject matter before the effective filing date of such patent.” See 35 U.S.C. § 273. Even where a defendant may qualify for this defense, however, he "still must engage in expensive litigation where [he] bears the burden of affirmatively raising and proving the defense.” See Nicholas A. Smith, Business Method Patents and Their Limits: Justifications, History, and the Emergence of A Claim Construction Jurispmdence, 9 Mich. Te-lecomm. &Tech. L.Rev. 171, 199 (2002).

. The majority's approach will encourage rent-seeking on a broad range of human thought and behavior. For example, because organizing a country into a democratic or socialist regime clearly involves a physical transformation, what is to prevent patents from issuing on forms of government?